**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

LYNELLE MARY HAMMOND,

                    CASE NO. 15-11796

        *Plaintiff*,           DISTRICT JUDGE NANCY G. EDMUNDS

*v.*                          MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT (Docs. 17, 18)**

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Hammond is not disabled. Accordingly, **IT IS RECOMMENDED** that Hammond's Motion for Summary Judgment (Doc. 17) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 18) be **GRANTED**, and that this case be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, 42

U.S.C. § 1381 *et seq*. (Doc. 3; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 17, 18).

Notably, Hammond previously filed for and was denied DIB and a period of disability in 2010. (Tr. 53-79, 80-88). A prior disability benefits decision has a preclusive effect upon the latter disability benefits determinations. *See* 20 C.F.R. §§ 404.988-404.989; *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997). When considering a renewed application for benefits, AR 98-4(6) and *Drummond* create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" showing changed circumstances occurring after the prior decision. *See, Click v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009). A Plaintiff must, to overcome the presumption, proffer new and material evidence that her health declined. *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). Although this may be done by comparing circumstances existing at the time of the prior decision to circumstances existing at the time of review of the new application, the ALJ does not need to review the record from the prior decision. *Id., Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 362-63 (6th Cir. 2004). In the instant case, the ALJ confined review of the medical evidence to that post-dating the prior decision to determine whether Plaintiff's health sufficiently declined.(Tr. 9.) Neither party argues that the ALJ failed to properly apply the standards surrounding this *res judicata* analysis.

2

Plaintiff Lynelle Hammond was forty-two years old as of January 3, 2014, the date of the ALJ's decision. (Tr. 18-19). Her application for benefits was initially denied on October 3, 2012. (Tr. 97). Hammond requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Ramona L. Fernandez on November 7, 2013. (Tr. 23-51). Hammond, represented by attorney Barry Keller, testified, as did vocational expert ("VE") John Norman Stokes. (*Id.*). On January 3, 2014, the ALJ issued a written decision in which she found Hammond not disabled. (Tr. 6-19). On March 20, 2015, the Appeals Council denied review. (Tr. 1-3). Hammond filed for judicial review of that final decision on May 19, 2015. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See*

3

*Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

4

>Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
>Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
>Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the

5

claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.  ALJ Findings

Following the five-step sequential analysis, the ALJ found Hammond not disabled under the Act. (Tr. 19). The ALJ found at Step One that Hammond had not engaged in substantial gainful activity following the alleged onset date, July 18, 2012. (Tr. 11). At Step Two, the ALJ concluded that Hammond had the following severe impairments: "systemic lupus erythematous, osteoarthritis of the knees, right shoulder pain likely secondary to rotator cuff tendinopathy, obesity, and coronary artery disease status post stent placement." (Tr. 11-12). At Step Three, the ALJ found that Hammond's combination of impairments did not meet or equal one of the listed impairments. (Tr. 12-13). The ALJ then found that Hammond had the residual functional capacity ("RFC") to perform light work, except with additional limitations as follows:

> May only occasionally climb, stoop, kneel, crouch, or balance. The claimant should never crawl or use ladders, ropes, or scaffolds. The claimant requires opportunity to change positions after sitting or standing after 15 minutes. The claimant may occasionally reach, push, or pull with the right upper extremity. The claimant is limited to frequent handling or fingering.

6

(Tr. 13-17). At Step Four, the ALJ found that transferability of skills was not material because Hammond could perform work available in the national economy. (Tr. 18). At Step Five, the ALJ found that Hammond could perform work as an information clerk or surveillance systems monitor. (Tr. 18-19).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has reviewed Hammond's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearings

##### a.    Hammond's Function Report

Hammond completed a function report on August 15, 2012, in which she asserted that she was disabled by lupus, inability to walk long distances, to stand or sit for prolonged periods, along with episodes of stiffening joints, difficulty using her hands, difficulty lifting more than two or three pounds, and fatigue. (Tr. 198).

Due to her ailments, Hammond had trouble walking, cleaning, doing chores, walking stairs, traveling, concentrating, and staying asleep. (Tr. 199). She required assistance getting dressed due to trouble with clasps and buttons, and required help to get into and out of the shower. (*Id*.). She did not require reminders to take medicine or perform personal care activities, but required reminders to go places a "few times a month." (Tr. 200, 202). Hammond ceased preparing her own meals due to pain standing

at the stove. (*Id.*). She performed no household chores due to lupus and heart disease, which prevented her from walking and performing exertional tasks. (Tr. 200-201). Hammond went outside once or twice per week. (Tr. 201). She required assistance when going outdoors "in case [her] knee goes out or [her] back locks-up." (Tr. 201). She did not drive due to soreness and pain resulting from repetitive movements. (*Id.*). Hammond's friend shopped on her behalf. (*Id.*). Hammond reported that she had no difficulty handling money. (*Id.*).

Hammond's hobbies included watching television, going to concerts, amusement parks, and socializing with friends, though she did not perform those activities "often or very well since [she] got sick." (Tr. 202). Hammond read and watched television regularly, though she expressed difficulty concentrating for the duration of television program. (*Id.*). She also confirmed that she no longer attended concerts or amusement parks, and did not regularly socialize with others. (*Id.*). She spoke with others daily, and her only regular social activity was doctor's appointments. (*Id.*). However, she also reported that she no longer socialized outside of the home. (Tr. 203).

Hammond reported difficulty with all listed postural and exertional tasks, including bending, using her hands, and walking, along with difficulties in terms of memory, concentration, following instructions, and completing tasks. (Tr. 203). She could walk only fifty feet without rest, and could continue after a ten minute rest. (*Id.*). She could pay attention for two to three minutes. (*Id.*). Her ability to follow instructions and concentrate was impaired by pain. (*Id.*). She could handle stress and changes in

8

routine "not very well." (Tr. 204). She reported an unusual fear of dying or being unable to "function at all." (*Id.*). She used a knee brace and glasses daily. (*Id.*). She also reported the use of medications which affected her vision, caused drowsiness, induced stomach pain, and weakness. (Tr. 205).

### b.    Hammond's Testimony at the Administrative Hearing

Hammond first appeared at an oral hearing pursuant to her 2010 disability benefits application. At the June 3, 2010, hearing before the prior ALJ, Hammond testified that she last worked in 2004, as a bartender. (Tr. 58). In that position she lifted up to ten pounds, walked seven out of eight hours, and performed cleanup duties. (*Id.*). She asserted that her ability to work was limited by the autoimmune disorder lupus, which reduced her ability to walk and use her hands. (Tr. 61). Hammond asserted that she was diagnosed with lupus in July 2008, and thereupon filed for disability benefits. (Tr. 62). She reported experiencing "flare-ups," usually in the hands, but which "can travel throughout [her] body." (*Id.*). During these flare-ups, she found herself unable to "bend or move around without being in excruciating pain." (*Id.*). Hammond's use of anti-inflammatory medication provided only inconsistent relief. (Tr. 63). She experienced a constant fever, also the result of lupus. (*Id.*). Hammond asserted that she could stand for perhaps an hour, and found that her knees and hands stiffen after resting, making returning to work difficult or impossible. (Tr. 63-64). She would also be unable to carry cases of alcohol, could climb stairs only with difficulty, and would have difficulty twisting off caps. (Tr. 64). Hammond stated that she slept only four or five hours per

9

night, and woke frequently. (Tr. 66). About half of her days were "bad days" with regard to lupus flare-ups, such that on her "bad days" she was barely able to "get out of bed or lift [her] leg over the bathtub to take a shower," or to unhook her bra. (Tr. 66-67). Consequently, she would "probably miss work those days." (Tr. 67). On a good day she could walk "maybe a couple blocks," but on a bad day she could walk only "about a block." (*Id*.). Hammond moved regularly to prevent stiffness in the lower back, knees, and hands. (Tr. 68). She sometimes found it difficult to straighten her fingers. (*Id*.). She experienced some weight gain because "it's hard to exercise when you can't even hardly move." (Tr. 69).

Hammond lived with her boyfriend, who took care of all outdoor chores. (Tr. 71). However, she reported that she might be able to cut the grass "on a good day." (Tr. 72). Hammond could drive, but did so as little as possible due to pain from operating the manual transmission vehicle. (*Id*.). Her boyfriend likewise performed the laundry duties, while Hammond would take care of some folding duties. (Tr. 74). Her boyfriend also cleaned the shower, cooked, cleaned dishes, and the bathroom floor. (*Id*.). Hammond experienced substantial pain from putting pressure on her knees, as is often required with bathroom cleaning, thus those activities were impossible for her to perform. (*Id*.).

Hammond asserted that she experienced pain between five and six out of ten in her joints, back, or knees. (Tr. 74-75). She did not often sit outside or go for walk, and only rarely went grocery shopping, and required assistance from her boyfriend to load

10

groceries into the car. (Tr. 76). She again emphasized that on "bad days" she was unable to get out of bed. (*Id.*).

Hammond took part in a second oral hearing on November 7, 2013, before ALJ Ramona Fernandez. (Tr. 23-51). Hammond described her health since the prior hearing as "up and down, mostly down." (Tr. 28). She described her biggest problems as involving her hands, walking, standing, and sitting. (*Id.*). She again complained of a constant fever, which caused her to sweat and feel uncomfortable. (Tr. 29). She also reported having a stent operation to remedy "heart issues," and asserted that she met with a cardiologist on a bi-yearly basis. (Tr. 30). Hammond also noted osteoarthritis of the knees, and bursitis in the right shoulder. (*Id.*). Hammond asserted that she used her knee brace only as necessary, "a couple times a month," to prevent her knee from "go[ing] out." (Tr. 31-32). Her knee condition was "about the same" from her prior hearing. (Tr. 32). She could sit for about fifteen minutes without moving, and could stand for perhaps fifteen minutes "depend[ing] on how [she was] feeling that day." (*Id.*). Likewise, her lupus had neither decidedly improved nor declined since the prior hearing. (Tr. 39). She described pain from this condition as "traveling" between different parts of the body, and asserted that her degree of limitation resulting from lupus varied significantly day to day. (*Id.*).

Hammond's ability to stand and sit was "about the same" from the prior hearing. (*Id.*). Hammond lived with a friend in a multi-story home at that time, and could only sometimes take the stairs; other times, she would remain upstairs in bed and relied on her

friend to provide her with food and other supplies. (Tr. 33). Hammond alleged that she found herself in this condition "two to three times a week, usually," which was unchanged from her prior hearing. (*Id*.). Hammond's average day included a thirty minute period to "get un-stiff to move around," relaxing in front of the television, eating, taking medication "if [she was] able to," and showering, a task which she could not perform alone. (*Id*.). These activities were largely unchanged from her prior hearing. Her social activities consisted of talking on the phone or receiving visits. (*Id*.). She enjoyed reading and watching television. (*Id*.).

Hammond reported that she could perform chores "sometimes," "when [she] feel[s] up to it," and otherwise put off chores or relied on her friend to perform them. (Tr. 34). She could not crawl on the floor, nor scrub a floor, nor could she vacuum. (*Id*.). She reported that she "tend[s] to just not feel good." (*Id*.). Medication helped to relieve some symptoms of lupus and sleeplessness, but caused stomach aches and a feeling of overall unwellness. (Tr. 35). Hammond also reported a drop in her overall quality of life, and a sharp decline in her complexion as the result of lupus. (Tr. 36). Hammond was not being actively treated for bursitis of the right arm, but had treated with a rheumatologist in the past. (Tr. 37). She was unable to raise her right arm above her head "most of the time," and could not use that appendage for repetitive tasks, because doing so would result in severe swelling. (*Id*.).

Hammond asserted that she could not return to her work as a bartender, nor could she perform office work, because her ailments would regularly cause her to be absent

from the job. (Tr. 39). She also found herself unable to type or to remove caps from bottles. (*Id.*).

### c.      The VE's Testimony at the Administrative Hearing

The ALJ at Hammond's first oral hearing called upon the services of a VE to determine Hammond's ability to perform work at the first hearing. (Tr. 77). The VE found that Hammond previously worked as a bartender, cook, and in retail sales, all of which were semi-skilled positions requiring light exertion. (Tr. 77).

At the second hearing, the ALJ concluded that Hammond's sales job was too remote to be considered past relevant work. (Tr. 41). The ALJ then asked the VE a series of hypotheticals to determine Hammond's ability to perform work. (Tr. 44). The ALJ first asked the VE to imagine a worker capable of performing light work, and who could perform Hammond's past work as a bartender and cook, but who was only able to "occasionally climb, stoop, kneel, crouch, crawl, or balance and should never be required to use ladders, ropes, or scaffolds." (*Id.*). The VE found that such a worker would be able to perform all of Hammond's past relevant work. (*Id.*).

The ALJ then added a further restriction such that the hypothetical worker would be able to change from sitting to standing every fifteen minutes, and would not be required to do any crawling. (Tr. 44-45). The VE found that these restrictions would preclude that worker from working as a cook or bartender. (Tr. 45). However, the VE found that such a worker could work as an information clerk and receptionist, of which there were about 83,000 jobs in the national economy; machine feeder, with 73,000 jobs

13

nationally; and counter clerk or laundry attendant, of which there were about 111,000 jobs nationally. (*Id.*).

The ALJ then provided a third hypothetical, adding restrictions to the worker's ability to "handle or finger on a frequent basis and should only occasionally be required to reach, push, pull with the right, upper extremity including overhead reaching." (Tr. 46). The VE found that such a worker could still perform work as a receptionist or information clerk, but that the other jobs identified would be precluded. (*Id.*).

In a fourth hypothetical, the ALJ asked whether a worker further limited to sedentary work could perform work available in the national economy. (Tr. 47). The VE found that such a worker could still perform labor as a surveillance system monitor, with approximately 17,000 jobs nationally, but that no other work would be available. (*Id.*).

Finally, the ALJ asked whether a worker who required three or more absences per month would be able to perform work available in the national economy; the VE confirmed that this restriction would eliminate all competitive positions. (Tr. 47).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence.

14

*Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

15

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Hammond v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting

16

objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Hammond v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-

17

related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a

18

disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.     Analysis

Hammond argues that the ALJ erred by: 1) Improperly evaluating Hammond's credibility, and 2) Failing to include all of Hammond's disabilities in hypothetical questions posed to the VE. (Doc. 17 at 5-7). These arguments will be addressed in turn.

#### 1.     *The ALJ Properly Considered Hammond's Credibility*

Hammond's argument begins with a heading announcing that the ALJ "improperly evaluated Plaintiff's credibility." (Doc. 17 at 5). Hammond then summarizes case law establishing that lupus generally produces pain and that pain can be disabling. (*Id.*). Hammond also notes that she is regularly prescribed pain medication for the treatment of lupus, and asserts that the ALJ failed to consider the limitations this pain places on her activities of daily living. (*Id.* at 5-6). Hammond does not actually argue that her pain and swelling are disabling, though a fair reading of this section implies as much.

19

Hammond's characterizations of the ALJ's decision are not well supported. Contrary to her assertion, the ALJ thoroughly considered her activities of daily living, noting that she did not have "marked limitations in activities of daily living," and that while Hammond needed some help getting dressed and bathing, she was otherwise able to perform personal care. (Tr. 12). The ALJ also found that Hammond could sometimes perform chores, spent time reading, watched television, talked on the phone, and visited with friends. (Tr. 13). Likewise, the ALJ noted that Hammond only occasionally used a knee brace, and that no objective evidence indicated difficulty ambulating. (Tr. 16).

The limited objective evidence regarding Hammond's lupus seems to confirm the ALJ's skepticism regarding Hammond's level of debility. On September 18, 2012, Dr. Bedia found that Hammond complained of lupus-induced joint pain which moved from joint to joint, but which produced no objectively determinable swelling, tenderness, crepitation, or effusion, and did not limit range of motion. (Tr. 419). The ALJ's finding is further bolstered by the lack of subjective complaints made during Hammond's various treatment sessions. *See, e.g.*, (Tr. 381-396). While Hammond's alleged inability to get out of bed several days per week due to lupus pain would undoubtedly have a grave impact on her ability to perform work, the medical records simply do not corroborate this level of limitation.

The ALJ further supported his credibility finding by noting that Hammond inconsistently reported that she did and did not use drugs (Tr. 17, 401, 417), and inconsistently reported that she performed no household chores, and performed some

20

chores occasionally (Tr. 17, 34, 200). These inconsistent statements provide good reason to doubt the veracity of Hammond's statements. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("As a matter of law, an ALJ may consider household and social activities in evaluating complaints of disabling pain."); *Adams v. Comm'r of Soc. Sec.*, No. 1:10-CV-503, 2011 WL 2650688, at *1 (W.D. Mich. July 6, 2011) ("In assessing a social security claimant's credibility, the ALJ is not prohibited from applying ordinary techniques of credibility evaluation, which would include consideration of a lack of candor in other areas such as drug abuse."). Particularly when considered in combination with the stark distinction between Hammond's relatively mild medical reports and her extreme self-reported limitations, it is clear that the ALJ fully satisfied his obligations to address Hammond's credibility under SSR 96-7p.

Hammond next quizzically raises the issue of noncompliance and its relation to credibility. (Doc. 17 at 6). While Hammond recognizes that "the present case does not involve the issue of non-compliance," she nevertheless argues that "the decision of the [ALJ's] references as they relate to Plaintiff's pattern of treatment has the flavor of at least suggesting non compliance." (*Id.*). Having scoured the ALJ's decision, the Court is unable to find any reference to non-compliance, nor any statement which might even reasonably implicate non-compliance. An ALJ's decision is not a soup, and it is not the role of the Court to detect the "flavor of . . . non compliance," even if one could be found. It is well settled that where arguments are "adverted to in only a perfunctory manner," those arguments "are waived," *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir.

21

2013), thus even if the ALJ's decision dealt with noncompliance, the Court would be disinclined to develop that argument on Hammond's behalf.

### 2. The ALJ's Hypothetical Questions to the VE Accurately Provided for Hammond's Supportable Limitations

Hammond next argues that the ALJ's questions to the VE did not account for all of her supportable limitations. (Doc. 17 at 6-7). "[F]or a VE's testimony to constitute substantial evidence that a significant number of jobs exist, 'the question[s] must accurately portray a claimant's physical and mental impairments.'" *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (quoting *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010)). Hammond specifically asserts that the ALJ neglected to account for her supportable limitations to walking and standing. (Doc. 17 at 7). She references a January 3, 2013, medical record in support of this proposition, though that record merely indicates that she suffered from osteoarthritis of the left knee (Tr. 436). Hammond also references three pages from October 30, 2013, in which it was recorded that she experienced "no clubbing, cyanosis and no edema" in her extremities, and "full [range of motion], no evidence of active synovitis and no evidence of muscular atrophy or weakness" in the lower extremities (Tr. 434), and osteoarthritis of the left knee (Tr. 436).

Hammond's citations provide precious little support for her argument. "The mere diagnosis of arthritis, of course, says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *see also Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 779 (6th Cir. 2008). Arthritis is not a *per se* disabling

condition, and it was incumbent upon Hammond to demonstrate to the ALJ how her diagnosis of arthritis supported her subjectively reported limitations. The ALJ partially credited Hammond's allegations regarding lower extremity pain, and limited her to "light work," and further restricted that range to work which required her to only "occasionally climb, stoop, kneel, crouch, or balance," and work which would never involve crawling or the use of ladders, ropes, or scaffolds. (Tr. 13). Hammond's duty at this stage was to identify specific medical data or physician opinions which supported her subjectively reported ambulation limitations. Instead, Hammond has merely gestured towards her diagnosis of osteoarthritis, and has made no effort to explain how this diagnosis supports her extreme self-reported ambulation difficulties. Hammond has wholly failed to explain why the ALJ's RFC finding insufficiently accounts for her ambulation limitations. Hammond has thus failed to demonstrate any insufficiency in the ALJ's hypothetical question posed to the VE. Because the ALJ's questions to the VE appear to adequately encompass all of Hammond's supportable limitations, the ALJ was entitled to rely upon the VE's pronouncements, and properly found Hammond not disabled.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Hammond's Motion for Summary Judgment (Doc. 17) be **DENIED**, the Commissioner's Motion (Doc. 18) be **GRANTED**, and that this case be **AFFIRMED**.

III.   <u>**REVIEW**</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Hammond v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection

24

No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections

are without merit, it may rule without awaiting the response.

Date:  September 22, 2016                    S/ PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge


## **CERTIFICATION**

     I hereby certify that the foregoing document was electronically filed this date
through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: September 22, 2016                      By s/Kristen Castaneda
                                              Case Manager

25